Good afternoon, your honors. May it please the court. My name is Robin Conrad on behalf of Samuel Lopez. I would like to say five minutes for rebuttal, please. All right. I'll try to watch your clock. Today, another plaintiff is here once again before this court on the eve of an execution seeking a preliminary injunction because of the state of Arizona continues to violate condemned prisoners' constitutional rights. In its towery opinion, this court said the death penalty must be implemented in a reasoned, deliberate, and constitutional manner. The state has not done this. Over the past few years, when Arizona's execution procedures have been under scrutiny, the state has made representations to the court to satisfy constitutional review and to allow executions to go forward. In looking at the state's actions in the past, along with its actions in these three most recent executions, this court should find that the state has not made reasoned, deliberate decisions in attempting to carry out constitutional executions, and it should not allow the state to execute Samuel Lopez on Wednesday. I will first discuss the access of counsel in the court's claim and then turn to the Eighth and Fourteenth Amendment claims. The access to counsel in court's claim is twofold. It involves a prisoner's right to in-person legal visits with counsel on the morning of an execution and a prisoner's right to access to counsel and the courts during the course of the medical procedure. Now, we didn't have occasion in the last case to definitively decide that because we were told that there would essentially be in-house, in-person access until, you know, shortly before the execution. So we've never actually decided the scope of that right, if any. Correct. The court, based on the state's representations, that didn't become an issue because the state said that they would allow access to the prisoner to have access to counsel. Well, you know, that's what did they say? They said we – I think because our objection last time was they said 9 o'clock the night before, and we said, well, that doesn't work. And so I thought they said that morning but without definition. But tell me if I'm wrong about that. They said that morning, and this Court cited to a protocol from 2004 which allowed access for the prisoner to have access to in-person visitation with his counsel up until 45 minutes before the execution began. After those two executions went forward under this Court's order in towery, the state then changed course and said, well, it would allow a visit between 6 and 7 a.m. in the morning, which is three hours prior to the scheduled execution. And in order for the state to limit a prisoner's access to counsel in courts, there needs to be a legitimate penological interest put forward. And this Court in California First Amendment Coalition v. Woodford talked about that test, whether the regulation is reasonably related to legitimate penological objectives or whether it represents an exaggerated response to those concerns. I'm sorry. The district court was and is of the view that the telephone, telephonic communication is just as good. And we did have a discussion of this at the last hearing, but it would be helpful to me for you to reiterate why you don't think that's the case. And, Judge Berzon, as we discussed during the last time around, there's issues related to competency and potential Eighth Amendment violations that can arise where access to a client on the phone would not be sufficient. And there's issues also that we raise of confidentiality. And during the last ---- Yeah. Could you explain that more? Because there's telephone. You said that isn't confidential, but the in-person visit is. Right. The prisoner can speak closely in range with the attorney who's sitting right in front of him or her. Are those calls recorded? I am not aware whether they are or aren't. But your point is that any officers who are in the vicinity could overhear the telephone conversation? Right. And it's harder to hear. The line isn't always good, so the prisoner has to speak louder, whereas an in-person communication would eliminate that. You wouldn't have to worry about talking loudly over the phone. The connection is there. I'm totally sympathetic to your argument, but my question has to do with the constitutional basis for it. I mean, because if there's access to counsel, do we have the authority or under what authority would we order that it must be in person and not by telephone? And how do we parse that out depending on how close it is to the execution? Well, and I think one of the problems, Your Honor, is that the protocol as written now says that the contact or in-person visits will end 9 p.m., but telephone contact will be permitted. In the execution of Mr. Towery, he asked to speak with counsel while the execution was occurring, while they were attempting to place I.V. lines. He was denied access. But that's a different issue in terms of whether or not there's a right to access counsel while the execution is ongoing, and we didn't address that issue before. Isn't that a different consideration than the pre-execution request? It is a different consideration for pre-execution requests, but what it demonstrates is that the Department of Corrections isn't giving clients access to their counsel when they ask for that telephone access. So it's imperative that the lawyers are ‑‑ So one difference is that if the lawyer is there, the lawyer can essentially enforce the right of access to counsel. I mean, it's kind of a circular problem. If they're there, they know they're getting the access. If they're not there, they don't know whether the client's asking for the access or not getting it. Correct. I mean, if there's no ability to have access, if the prisoner wanted to call his lawyer and was denied that access, there would be no way for counsel to know. But if counsel has the ability to visit in person with his or her client on the day of the execution to determine whether there's competency issues, there's last‑minute litigation. Are you asking for ‑‑ you know, your claim keeps changing, too. So is your claim ‑‑ was your claim before the district court that you have a right through the time of execution to have counsel present? I think it's a two‑part claim. The first part involves the right to have an in‑person contact, a visitation with the lawyer leading up until the execution. At a reasonable time, plaintiffs recognize that the Department of Correction has a legitimate interest in preparing for the execution. However, as we've cited in our briefs, there are logs that indicate in the past they've started preparation one hour before. So to limit access three hours before, they've not presented a legitimate penological interest in order to say counsel ‑‑ So does your claim that the presence of counsel caused delay in the Tara case? Is there any evidence of that? Not that I'm aware of, Your Honor. That's what their logs say, that there was some cause of delay. And in the Mormon case, in fact, the counsel was at the same time and there was no delay. There was a ‑‑ I think the execution was supposed to start at 10, and the record says it started at 10.21. So are you asking for in‑person up to an hour before? That would be, in our opinion, reasonable. What about two hours before? If the state is able to show a legitimate penological interest. And at this point, they haven't. They've said in the district court, in his opinion, below denying relief on this issue, adopted his analysis from the first time around. The district court's premise is that there essentially isn't any right of in‑person consultation as long as it's telephonic. Well, that is part of it, but also that there is a legitimate concern for the confidentiality issue that was raised before, that saying if a lawyer's there and they could see the people or know who's participating in executions. You know, we're here on a preliminary injunction, and so on both the state and, in this case, Lopez used to be West Howard, things continue to float. So I'm just trying to understand, we're reviewing the district court on an abuse of discretion on a preliminary injunction, so be more precise as to what, in your view, he did wrong. He found that the state had raised legitimate concerns about the confidentiality and the need for confidentiality, and that's why the state is limiting access to counsel on the morning of an execution. What did the record show to support that finding? What was in the record to support that finding? Absolutely nothing, Judge Rawlinson. Was there anything in the record to establish the historical observance of the 45 minutes before execution, whether or not there were any issues raised, were there any problems? Was there anything that would precipitate changing that in the record? No. And, in fact, we actually submitted in TOWERI, the ERs for TOWERI last time around, two declarations from attorneys who had legal visits during the 2010-2011 executions where they said there was no problem, they didn't remember the identity of anybody that they saw, that they needed these visits to be able to communicate with their client. What about this record? I mean, was that argued to the district court so we could get it? That was from TOWERI ERs 122, 124, and 125. But was that brought to the attention of the district court in the preliminary injunction hearing in this case? I'd have to double-check the record. I'm not sure if we cited to those. Yes, I believe we did cite to those. Are the attachments we, in general, are the attachments and excerpts that we have and things that were before the district court on this preliminary injunction? Because there's a number of material that's from earlier. Well, and it's the same case before the court below. So the court has considered this evidence and the district court has relied on evidence from prior knowledge of this lethal injection litigation. What about, we also discussed last time, the fact that the protocol as written has an exception for religious personnel. That doesn't seem to be anywhere in your briefs this time, and I have no idea what's going on with that. It's just sitting there. There hasn't been any such person, but there could be. But we don't know what, as the director said, what time that person could come. No, I am not aware of anything regarding the religious. So we don't know whether that person would be held to 7 o'clock as well or what? I could double-check. But in the protocols, they say attorneys and chaplains. I mean, they talk about attorneys and chaplains, and then there's, you know, how it's changed over time. Correct. There's still, it's at the discretion of the director to be permitted. The current protocol says that? Yes, it's. Yes. Thank you. At ER 259, under Department Order 710.11, 1.5.1, that's where it discusses the visitation privileges are terminated the night before at 2100 hours, and the attorney will be permitted to have telephone contact with attorney of record and to have non-contact visit with a facility chaplain if requested. So it doesn't say it's discretionary. It says that with regard to the chaplain, there is a non-contact visit thereafter, i.e., after 9 o'clock. We don't know when. We don't know when. And that, I would say that is discretionary because the. I'm sorry? That is discretionary. The second sentence. That is discretionary. It doesn't say that. The second sentence of the Department Order 710 says, these procedures shall be followed as written unless deviation or adjustment is required as determined by the director. So the director has ultimate discretion, as he has testified to in the past, to make changes as needs be. So as far as timing or whatnot of religious. Where is that? It's sentence two. Is that an overall sentence? That doesn't have to do with. No, it's just in the ER 245, the purpose of Department Order 710. But it doesn't have to do specifically with counsel. It's just a general catch-all. Saying that there's. But the counsel says the inmate will be permitted. Religious. Contact with attorney and facility chaplain. It does say that. Okay. And as I indicated earlier. What about what Judge Rollins was asking you about? Towery apparently did ask for counsel while there were problems in citing the I.V. during his execution. And at least it appears that way. And so what exactly is your contention about what should have happened at that point? Or what are the limitations of it? At any point during the execution, if there's an apparent issue during the execution or what? Your Honor, if there. While the execution procedure is taking place, while the medical procedure is taking place, if a prisoner asks to access his counsel, then he should be given that right. Now, what case authority are you relying on for that proposition? Because that extends well beyond anything we've addressed thus far. I would refer this Court to one of the many Ohio decisions in CUI at 2011 Westlaw 320166. In particular, around pages 11, 12, 13, where the judge is talking about on a summary judgment issue, the denial of access to counsel during the time that the I.V. procedure is occurring. That if there are problems and an Eighth Amendment violation might be arising. Well, that's why I asked you the question I asked you. That's a slightly different position than the one that you were advocating. Your advocating, as I understood it, just whenever they ask for it, they get it. And that does seem like a fairly extreme position. On the other hand, in this instance, there was at least a substantial delay in citing the I.V. I don't know that we know at what point he asked for counsel. We probably don't. But if he were to ask for it, say, after an hour of this, in order to press a position having taken an hour, there was sufficient either pain or at least disturbance that they shouldn't be allowed to go forward. That would be one thing. But if he just asked for it after five minutes, it might be another. Well, I don't know, Judge Berzon, that we can put a time limit on it. Only because what if they were attempting to set a line and they did something that was excruciatingly painful? I understand that. So that's why it's a hard problem, because it seems an untenable or at least an unprecedented position to say at any point. I mean, obviously, that could just completely screw up the ability to carry out the execution at all. On the other hand, it does appear that things can arise during the execution that might give rise to some legitimate legal claim. So it seems to me you'd have to be able to judge it by that. Then you have the further problem that we don't know what happened because no one's telling you or us what actually happened. Right. And I think the solution to this problem is to have counsel available there to view the insertion of the IV, so that if something does go wrong, counsel Then what happens? Then what happens for what? If the counsel calls up the district court, realistically, you know, and then the district court's going to stop the execution based on the counsel's phone call, or you're going to take out the — I mean, as a practical matter, I'm having some trouble understanding this. I understand it theoretically. I'm having trouble understanding it practically. So I want you to tell me exactly what would happen. So practically, if the attorney was either in the room or witnessing from the window with audio ability to hear what was going on, and there was a problem that arose to the level of a constitutional violation, that's not to say that the attorney's going to run and jump and call the court for no reason. But if there was some significant serious risk of harm that was happening, And the attorney — Then the attorney would — And then what happens? Based on speaking to the prisoner and then call the courts and or the courts or the governor. Or a slant. That's what happens. Or an alternative is the lawyer really can't and doesn't do anything, but is at least an observer for purposes of establishing for other cases, essentially, what happened. And what disturbs me most here is that we never find out what happens. In fact. I agree, Your Honor. And there's Ninth Circuit precedent in the First Amendment coalition where California, it was a different situation, but there was a First Amendment right where the witnesses said, we want to watch the IV. But you haven't brought such a case, neither has any media person, exactly. You're trying to substitute the lawyers, essentially, in that role. Well, we're not trying to substitute the lawyers. We are trying to ensure that our clients' constitutional rights are not being violated. In this case, Mr. Lopez is, before this Court, asking for a preliminary injunction because he's raised serious concerns and questions going to the merits. But you see, in a weird way, his interest was not in having the lawyers present at his execution, but having the lawyers present at Terry's execution. Because if lawyers were present at Terry's execution, we would — you know, something more than a black hole as to what actually happened there. So there's kind of this rolling problem, which doesn't accord with any ordinary understanding of the right to counsel. And that — I think that's a whole other topic. But I think the topic in the constitutional violation here is that the prisoner who is being executed, if something goes awry and if there are problems, he should have access to counsel in the court. And we know from the undisputed facts that were presented below, the State hasn't said what happened, hasn't, you know, presented anything, any evidence to contradict the declarations that were submitted by Mr. Lopez. And you think those declarations demonstrate that there was an Eighth Amendment violation or that there might have been an Eighth Amendment violation or what, exactly? The declarations demonstrate that he was denied access to counsel and there could have been an Eighth Amendment violation. We'll never know. Mr. Towery is now dead, but we've shown enough that we've demonstrated also with evidence that his femoral artery was punctured. And that leads me in, if you don't have any further questions about the access to counsel in courts, since my time is quickly going, to jump into the Eighth and Fourteenth Amendment claims. So these are two separate claims. And as Bays stated, that the Eighth Amendment will be violated where there's an objectively intolerable risk of harm for which the State cannot be subjectively blameless. And here, again, we're on a preliminary injunction standard that Lopez has shown serious questions going to the merits of the claims that the State's actions have at minimum burdened his right to be free from cruel and unusual punishment, or at most will violate his right to be free from cruel and unusual punishment. And is that based on the last execution? Is that what it's based on primarily? It's based actually on the history of the Department of Corrections. Because they are exercising their discretion in a way that's not reasoned and deliberate, and therefore it's violating the Constitution. You have to be a little more specific. Okay. So, and I'm going to try to do this very quickly. But I think it's important for the Court to understand the history. In the Dickens case, which was the first case that challenged the protocols of the Department of Corrections, in that case, the plaintiffs put forth evidence that using a femoral line was a painful surgical and basic procedure, and the defendant shouldn't be doing that. The Department of Corrections should do what all the other States do and use peripheral IV access. As a result of that discovery and whatnot that happened in Dickens, the State agreed to change its protocol. And it changed its protocol to basically mirror Bayes as much as possible and added additional safeguards. And they used peripheral, their written protocol said we're going to do peripheral access, we'll only do femoral access if we cannot get peripheral access. This Court found that written protocol was constitutional, cleared the way for executions. Five executions occurred in 2010, 2011. And plaintiffs learned that the State was not following its protocol. It wasn't following its written protocol. And there was a trial, and that was in the West case. And in that case, the State justified using a femoral line and said that it would use a femoral line in West because to administer the drugs in a small peripheral vein that was below the elbow, that creates a significant risk for adverse. Are they talking about a three-drug protocol at that point? They were, but they were talking in particular about the pentobarbital. And if you look, we attached addendum number seven, which is the execution logs from the West execution, where it's specifically written in there that their doctor, who they paid $18,000 in execution and trusted his opinion, that the drugs should be administered through a large peripheral vein at the elbow or closer to the heart, otherwise there's significant risk of adverse effects. And that was their finding. And Judge Wake adopted that and said this makes sense. There's denied relief saying that there's a reason for using the femoral line, and in part because there's a risk of burning sensation when they inject the pentobarbital through a smaller vein. Now you come to the last three executions they've had. Mormon, they set two peripheral lines. Towery, they couldn't set peripheral lines. We're not sure why. There's evidence that we presented that his veins were good. And they set a femoral line and decide to use the small hand vein as backup, despite using that excuse for going femoral in the past. So the state can't have it both ways. They can't say, here's why we're doing this, and to allow the court to pass constitutional muster of their protocol and then change course. And that's what the State keeps doing. But they never used it. I'm sorry? They never used it. They never used what? The hand peripheral vein. They didn't need to in this particular situation. Right. But they set it, and the reason why they're setting a backup is in case they need to use it. But what are they supposed to do? What, in your view, should they do? For? For backup. They try both. If it doesn't work with a particular individual. Well, we actually don't know the facts involved specifically with what happened in the Towery execution. Well, so it's pretty hard for us on a preliminary injunction with that kind of representation to say that's going to be the basis of serious questions. So I'm just trying to understand what's the factual basis we should be looking at. Well, Judge McEwen, I think it's important to realize that they knew, based on their doctor's opinion, that this would cause a risk, that there would be, they even wrote it in their logs before that they weren't going to administer the drug. I mean, the truth is they didn't expect to do it. I mean, this seems like a, they had every reason to think they weren't going to have to do it. I mean, if you're going to complain about something, it seems, you know, that you have more actual things to complain about than something that didn't happen. Well, it didn't happen in this case. But why would they be treating one prisoner differently than another? We know why. Because they tried peripheral veins on both arms and they didn't work. And they had another alternative which they intended to use, which was the central line. So it's not that we don't know why. We sure know why. Well, and also in Kemp, the most recent execution, there was a puncture mark on his forearm where the line was not set and then there was an IV placed in his left elbow and then a central line placed. And there was no attempt to set a line on the right arm. And it just seems that the state of Arizona is not making reasoned, deliberate decisions when they're trying to determine what is the best way. But what's your basis for saying that? I mean, I hear the concern about the changing landscape and the changing protocols or decision to do A, B, or C. But I'm just trying to understand what I'm putting it up against in terms of either a rationale or your rationale that it raises a risk of harm. Well, when they know that there's a risk that this would cause pain, they cannot be subjectively blameless. But just the cause of the pain is not a violation of the Eighth Amendment. I mean, there is some pain attendant to an execution. Right. But when they know that there is what they had written in their log, significant risk of adverse effect, then they can't claim that they're blameless. In the last case, you were challenging, and I can't tell whether you still are, as the cause of some of these issues, the qualifications and the training of the people doing the IV work. Is that still part of this case or not? I think there is an issue related to qualifications and training. The State made the representation last time before this Court that for Mormon and Towery it would have a medically licensed physician and a nurse with 17 years of practice. There's nothing that says that the medically licensed physician knows how to set a peripheral or, I'm sorry, a central line. I see my time is up, and I've run through rebuttal time, too, so. I'll give you some rebuttal time. Thank you. Hey, police court. My name is Jeff Sick. I'm with the Office of the Attorney General, and I represent the defendant in this case. On these uncontested facts below, there is no showing that any inmate in the last three executions has suffered unconstitutional pain. Yeah, but what's very disturbing is how would there be? I mean, because the lawyers, unlike in California and Ohio and other places, there are no witnesses to the actual execution. The lawyers are not present. And the State's protocol, State's diaries or notes are extremely opaque, and they don't say anything. So we, for all we know, Tally was, you know, screaming bloody murder about being in pain, and nobody would know. I mean, you wouldn't know either, probably, but your principals would know. Well, we know they were in touch with you, at least according to some of the evidence. According to one log, my name did show up in there, yes. Yes. Isn't that indicative of maybe there was a problem because someone felt the need to consult the AG's office regarding whatever? No. The protocol calls for the director to contact the Attorney General's office at least two times prior to an execution. In that particular case, there was no problem. Of course, there's no evidence in the record of that. But on the other hand, I mean, if the director has, quote, a right to counsel during the execution, why doesn't the petitioner? Well, the director has his own counsel. It's called general counsel. The only reason the director calls the Attorney General's office two times prior to an execution is simply to find out if there's any litigation. And during the execution. During. Well, it is during. It's prior to the inmate being moved into the execution room, and then it's after the inmate has already been in the execution room and having IVs placed. But in response to your question, Judge Berzon, there's two things. One, I think we have to remember that these are public officials doing a public duty. Exactly. So why should it be so secret? Because there's a presumption that they are doing their duty lawfully. And they're not really secret because they do maintain logs with respect to what happened. But the logs didn't say anything. I saw the logs. But the second thing is that you have two medical professionals that are there attending to the inmate. But the medical professionals don't know the legal ramifications of anything that occurs. Well, I think the medical professionals do understand the pain that is going on with the inmate. And if the inmate is suffering pain, I believe they would bring that to the attention of the director. Why do we believe that? Do they have any authority to? Are they charged with doing it? Because the director understands his duties under the Eighth Amendment. And, in fact, in the West trial, he testified that he understands what the Eighth Amendment and what he has to comply with in respect to carrying out executions in Arizona. And the district court found that he did, in fact, understand those compliance or the compliance with the constitutional requirements. This is a public official that I think courts can presume carries out his official duties lawfully. But that presumption can be rebutted. The difficulty is how do you get the evidence to rebut the presumption if the attorney is not allowed access to the process? And if the inmate asks for the ability to consult with this attorney, that's denied. How do we get that information that would rebut the presumption? Well, Judge Rawlinson, these are publicly witnessed executions. So attorneys are available to view publicly the execution. But only after the lines have been inserted and after. I mean, that's not done publicly. That's – well, that's true. However, the inmate does have the right to have last words. He's not argued – well, in Thomas Kemp's case. Well, you haven't refuted the statements in the record that they are told that if they say anything against critical, the mic will be shut off. I don't know whether that's true or not, but you haven't refuted it. No. What they are told, from my understanding, is that if they are going to use profanity or talk of – Right. But there's uncontested evidence. Now, because you haven't contested it, it doesn't say that. That's true. It says that if they say anything critical of the Arizona Department of Corrections. That's what it says. It says that. However, I don't believe that – well, I mean, it is uncontested. I mean, that's just as uncontested as you say the pain evidence is uncontested. If you're not going to contest it, it's uncontested. I'm sorry. I didn't get that. Since you haven't put anything to the contrary, that's the record we've got. It is uncontested. I don't believe it rises to the level of a constitutional violation. That's not the question. I'm sorry. The question isn't whether it rises to the level of a constitutional violation. The question is whether your representation, that we can count on what the prisoner's last words were as being informative, is supported by the record. And the answer is no. Well, I think in all three of these cases, we know what the inmate said in his last words. And in all three cases, no inmate indicated that they suffered pain. Well, the evidence here, which you can believe or not believe, is that this was coded on purpose. That there was a code between the lawyer and the inmate in order to avoid being cut off, because their understanding is that he would be cut off, and that the code was used to indicate that, in fact, he did ask for a lawyer at some point, and, in fact, that he was in some pain. We don't contest those facts. I mean, the coded language in this solemn procedure was used in order to, if you read  But you weren't contesting those facts. You were saying that he didn't say anything. Well, apparently, you did say something. Maybe we're missing each other, Judge Berzon, and I apologize for my mistake, but the inmate did say these coded words. We're not contesting that.  It's not that he didn't say anything. It's that it could either have been that he suffered pain or that there were problems. We know that there were problems with Towery's execution as far as the placement of the IV. That's documented. We know that. But that's the best part. For the next time, they should have a better code. Well, we'll leave that up to the next one, I suppose. But the problem is that. But that's one of the issues, is that this case is in the district court. We haven't had a trial in this case. But the State of Arizona insists on going forward with these various executions. So we're always on a rolling ship with the State of Arizona, and we haven't had a trial on the protocol. I mean, the last time we were here, you recall quite well, we had the last-minute drug snafu, and we had a brand-new protocol that we'd never seen or anyone had ever seen before. So we're never dealing with a fixed situation that we can say, well, yes, this is a problem, it's not a problem, because things are always moving. And you say, well, the next time. But if there's no record about this, then next time will be the same thing until we have a trial and somebody can put in evidence. So why, how can we have any comfort that this is going to go as planned? When you look at the last three executions, after the amendments in January of 2012, and the Department used the one-drug protocol, we know what happened with Moorman's execution. We know what happened with Towery's execution. There were problems placing peripheral IVs. We know that. We know with Kemp how his IVs were placed. Well, with Towery, we don't know why those problems occurred, and we don't know whether or not the problems that occurred were attributable to the deficiencies in the protocol that had been articulated. That's the problem I'm having with trying to resolve these cases. I just don't think we know enough about whether or not the protocol attributed to the problems that were experienced. I don't think the protocol attributed to any problems with placing an IV in at least in Towery. Well, for example, the earlier protocols and the protocols in Bays and the protocols in Ohio have extensive rehearsal and trainings. And this one had some minimal training the day before without actually any placement of IVs. Is that right? Well, I think you're talking about the IV team. Yes. And with respect to those. And everybody else as well. Those two members. No, that's not true with everyone else. Everyone else is still subject to the ten trainings per year. It's the IV team, and that's simply. I didn't see that in the protocol. That's simply because. You think the protocol still provides for these ten trainings? I think the training that goes on for the special operations team, which are essentially employees of the department, they're still practicing. But those people have nothing to do with placing the lines. That's true. It's the IV team members that are outside contract people that come in, and that's the doctor and the nurse. First of all, it doesn't say they're a doctor and a nurse. Are you telling us again that this would be a doctor and a nurse? Yes. Well, why isn't this in the protocol? Because, well, it's not in the protocol because it's extremely difficult to find a doctor or a nurse. Now, it's in the protocol that if a central line is used, it has to be done by a medical physician with the relevant experience to do that. Right. But it's very difficult to find medical personnel to come and participate in an execution. So I don't necessarily know that or have reason to believe that it should be written in the protocol. The director prefers to have those individuals on the IV team, because the protocol clearly calls for individuals with the relevant experience to do so. For Mr. Lopez, that is who is scheduled to be there, you're saying? That's correct. A doctor and a nurse. That's correct, both of whom have relevant experience. And they are characterized as the IV team? That's correct. And the medical doctor would be the IV team leader. So he would be the one discussing with the director the discretion on where to place IVs. But the Bay Safe Harbor in the previous protocol specifically had qualifications for the IV team, as well as the training for the IV team, and that's no longer in the protocol. So that's why I asked the question as to whether or not the change in the protocol might have led to the complications and how would we know? I don't believe so, Judge Rawlinson. The reason that in the Kentucky protocol, Kentucky doesn't use medical doctors, or I think they use phlebotomists and nurses, but they don't use medical doctors. With respect, and I believe, I may be mistaken, my recollection of reading Bays was that those individuals were Department of Corrections employees that performed those duties. In Arizona, their medical staff will not participate in executions. That's why the department needs to go outside the department to find medical personnel to do that. Having those individuals come in, you know, knowing that they do that as their regular job, the director felt it would be unnecessary to bring them in for ten trainings per year and have to pay them a The protocol doesn't say that they do that as their regular job. It just says they're appropriately trained, and there's a difference between being trained to do something and actually doing that as part of their regular job responsibilities. That's correct, and if the situation arose where there would not be those individuals that did that as their regular employment, then they would be subject to the training necessary. Was the training part of the district court this time, though, on the preliminary injunction? I don't believe it was on this time. Okay. I didn't think so. I'm just trying to figure out what's In this case. No, it was in the West. It was previous. It was in the previous case. And you're standing up and telling us things that would happen, but none of it is written down, and none of it The problem is that the way Arizona is operating now, it is not binding its hands in any way in advance. It's operating on an ad hoc basis. So there's no written, detailed protocol at all. And it isn't informing anyone after the fact in any detail of what actually is happening, which is not itself an Eighth Amendment violation, but it may give rise to Eighth Amendment violations sufficiently to create due process problems. Why not? Why not have individuals Well, why isn't that? Isn't this way of proceeding, which does not partake of the, to my mind, the Bay Safe Harbor, because there are simply no commitments made in advance with regard to training, with regard to qualifications, even with regard to which drugs are going to be used. So it's all being done, or with regard to access to lawyers or much of anything else. Everything is being done on an ad hoc basis. And then retrospectively, in order to find out what in fact happened in the last go-round, to find out whether there is a serious risk of, a substantial risk of serious harm or pain, that's not ascertainable, at least short of a full-blown trial. So how can anyone, either the inmate or the courts, be assured that there is not the requisite risk? Well, there isn't. If you look at the protocol itself, the written protocol, it has guidelines for the director to follow in carrying out an execution. There are qualifications that individuals need to meet in order to be placed. Suppose I thought those qualifications were on their face inadequate. But on the other hand, you stand up here every time and tell me they have a doctor and nurse. I'm not going to say the doctor and nurse is inadequate, but if I think what's written down there is inadequate, what happens? Well, I don't know what else could be written in the qualifications of the individuals of the IV team. Well, what could be written is what was written before, which is somebody who has some, first of all, current experience. I mean, we went over all this in the last hearing, right? We did. As far as the thing is written down there, you could have somebody who 20 years ago was in a military unit and set some IVs. That's what's written down there. That's not what you're doing, but it's what's written down there. If I were to look at what's written down there, I might say, well, say, this is just not adequate. If I look at what you're actually doing, I'll say, well, why am I going to invalidate a written protocol when, in fact, it's not what they're doing? But you end up with this double, dual problem, which is you're not announcing in advance any controls over what you're doing, and there's no way to find out after the fact what you're doing. Well, if you – the only reason – the only thing I can say, Judge Berzon, is that the written protocol has the qualifications. Now, it doesn't say the current. That was written out of the protocol in the January amendments. And it doesn't have the training. So you're standing here saying, well, if we had people who weren't doctors and nurses, of course, we would train them. But that's not in the protocol. But the protocol provides for the training for at least one to two – one day prior to next week. But not anything about setting IVs. Nothing specific about setting IVs. Well, they don't set IVs in the training. That's right. That's not part of the training. But that used to be the – It never has been. Well, it wasn't in Texas – in the Bays case. It may have well been in the Bays case. It was. But the Bays was using employees of the department in order to do their IV setting. And you are potentially using people who are walking off the street and haven't done this in 20 years, potentially. Now, you tell me you're not doing that, but potentially you're doing that. I think that's where the director's discretion comes in and the presumption that he's going to do his job lawfully. If he's finding individuals that can place these – for example, if he decides – if the central line is going to be used, it cannot be done without a medical physician with the relevant experience to do so. So he does exercise the discretion in placing the IVs and taking the advice of the medical or the IV team in that respect. So I think the protocol does have guidelines and they're constitutional guidelines to ensure that the execution is safe. Could we move to the access to counsel? Can you explain why the department thought it was in the interest of the department to eliminate access to counsel the morning of the execution? There's confusion on this issue. And it's my fault for that confusion in the briefing. After the Thomas West execution, the director was very concerned about confidentiality of then the medical team. He had decided to limit contact visitation the morning of the execution in order to allow the medical team, the special operations team, to come into the housing unit to prepare for the execution. Now, when they were doing the three drug protocol, the three drugs, in order to place all of those drugs in the primary and the backup set, it took a lot of time. So the director had decided to do that. But it was mainly for confidentiality and to run a smooth execution, because the Arizona Supreme Court sets these for 10 a.m. The director wants them to start at 10 a.m. When the amendments were made in January 2012, it took out that discretion for the morning of contact visitation. After this court's opinion in Towery, the director agreed at the time, when we were here last time, that visitation would occur the morning of, contact visitation with attorneys. This court decided, or asked, if it could take place under the 2004 protocol, which called for a visitation up to 915, or 45 minutes prior to the start of the execution. The director agreed to do that the day of oral argument. For those two executions, that's what occurred. After those two executions, it was after Mormon and Towery for Kemp's execution, the director decided to go back to what he had used as discretion prior for the Landrigan, King, Beatty, Bible, and West executions, allowing attorney contact visit from 6 to 7. Now, if the inmate wanted to have a religious person come in, that person would come in prior to that visit. So he wasn't prior to the attorney contact visit. He was at 6 to 7 in the morning. Right. So the director used his discretion in order to allow for attorney contact visitation. But that discretion is not unfettered. There has to be something in the record indicating that having access to attorneys, as had been previously allowed up to 45 minutes before the execution, somehow compromised the process. And is there anything in the record to substantiate that having access to attorneys up to 45 minutes before the execution compromised the process? No. The only thing that's in the record is this was argued before the district court the last time, prior to our oral argument before this court. And there was simply just argument on that issue. The protocols going back to 2004 and even prior did have that in the protocol. But you remember that there was a hiatus of executions in Arizona between 2001 and 2007. Right. And it wasn't until 2007 when this version was approved. Well, I know. I'm not sure the bottom of it. Are we going to basically be in a negotiation with the director every single execution? This seems so ill-spirited without a reason. So if we were offered up a reason, we used to have three-judge drug protocol, and you've given us a reason why that needed a longer lead time. Now we have the one-drug. Well, it depends. I suppose there could be a choice made. But right now we're on the one-drug protocol. You're saying 6 to 7 in the morning. I mean, our role isn't to micromanage, but we're also we're on such a rolling proposition that counsel doesn't ever know what will be the rules for the next execution. So why can't you settle on something reasonable on the morning of and just call it a day on that question? The director believes that the 6 to 7 attorney contact visitation is reasonable for the reason. The director said that there was some the one thing that the Lons did say was that he claimed that there was some delay caused by the lawyers, but that seems completely belied by the fact that in the Mormon execution, the execution went on timely. So the delay seems to be due to problem-setting the IV, and there's nothing in the record to substantiate what he said. Well, I think I'm I don't mean to parse this out, Judge Brezon, but the Mormon execution I believe ended at 1030 or 1036 or somewhere along those lines. It wasn't as quick as the last execution, which had the 6 to 7, and it was simply a matter of minutes after 10 o'clock. So the execution did start on time for the last execution. My understanding is that they don't start doing the setting of the IV lines until the time set for the execution, which is 10 o'clock. No. They start before 10 o'clock to set. The idea that the director, he wants the execution to start at 10 when the Arizona Supreme Court sets. What does it mean to start the execution? What starts the execution? Reading of the warrant, opening of the curtain prior to reading of the warrant. And so at that time, the lines have already been placed? That's correct. Has that ever happened? Has whatever happened? That the lines have been set before 10 o'clock, before the warrant. Well, with Towery, it didn't happen until later. I understand that, but I'm not sure, but just looking quickly through the logs, it didn't look like that ever happened. I think with the last execution, it did happen. With the prior executions, based on placement of IVs or difficulty placing IVs, this was a different situation that the director was under with respect to the Mormon and Towery executions. At any rate, at this point, you're asking for 9 o'clock, which is an hour. And your response to that is? Well, the director believes that 6 to 7 is still reasonable, and it allows for the clearing out and the getting ready for the execution to start. So essentially, with regard to everything, your argument is for discretion, rather than for – so if the director next week and the next execution believes that they shouldn't be there from 6 to 7, then he'll say that they have to leave at 11 o'clock at night, and then he'll come and tell us that there's – that that's what he now believes. No. What I can tell you is that the director believes that mourning of contact visit with attorneys is going to happen. Well, why? I mean, there's nothing in any protocol. There's no commitment. And – I thought I just heard a commitment. But it can change. Can it change, or are you going to keep that in the upcoming executions pending a trial? My understanding is that the director will not change the mourning of contact visitation between 6 and 7. If this court were to order otherwise, he would have to follow whatever this court orders. What about the – having a doctor and a nurse execute – do the execution as opposed to whomever was doing it before? Is that a commitment, or that can change, too? He's always had a medical doctor for the executions while he's been the director. I thought they were using maybe in addition to the medical person, somebody who had done some IV placements years before in the military. Right. They did. For this execution, he has – or the department has a medical doctor and a licensed nurse. But that's not a commitment. I'm sorry? But that is not a commitment. It's not a what? A commitment. A commitment for this execution? No, in general. No. Well, his preference is to have that, but you've got to understand that it's really difficult to find these individuals who want to participate because of various reasons. Here's my difficulty. You know, without some kind of firm procedure, we'll be – every time there's an execution, we'll be sitting here doing this. And that's not – I mean, it's just really difficult for me to agree that this is a good way for us to make these determinations. It's very troubling to me that we're kind of, you know, at the last minute deciding, you know, these matters, literally of life and death, with no firm guidelines as to what we're actually looking at. In terms of the access to counsel, I just don't see that there's anything in the record that would support the director saying that there are safety concerns, that there are concerns that would delay the process in adhering to what worked for a number of years without any problems in the record regarding access to counsel. And to me, that's the most important – that's the most important right that a condemned person has. And I just don't see why we should say that the discretion of the director should be acceded to without anything in the record. That's my biggest problem I have with this whole procedure. Well, if I can speak to that, Judge Rawlinson. There really wasn't any record on this issue because for the executions going back to Comer all the way through West, this wasn't an issue. Attorney contact visitation was allowed between 6 and 7 a.m. the morning of. But I'm talking about before that. When access was allowed up to 45 minutes before, there wasn't an issue either. I can't speak to those executions because they were so long ago. The record doesn't show that there was ever a problem, there was ever an issue. But on the other side of that coin is there's no authority saying an attorney has a contact visit right or the inmate has right to a contact visit the morning of an execution. So it's – Well, I don't think they're asking for a contact visit. I think they're asking for – well, I think they were asking for a contact visit. In person. In person, yeah. It's an in-person visit. That's right. Contact visit. So, yes. Well, I assume if we were – so we wouldn't – if the court were to direct the director to change, to modify the protocol so that at a minimum at 6 o'clock, that no later than 7, he wouldn't have an objection to that, right? No. That he would have an objection if we said 9 o'clock? My understanding is the director would like to have time in order to clear the housing unit, to have his IV team come in and have everything set and ready to go at 10 a.m. when the Arizona Supreme Court – the other thing is there's also the movement of witnesses into the housing unit in order for it to be publicly witnessed. Well, if you just back it up, I know they have in the protocol what you do 12 hours before, and I assume there's literally a timetable. There is. How much time does he really need? I mean, that's really a question. Honestly, three hours he would like, but, I mean, realistically, to meet that timetable, to bring in the witnesses, to clear the house, to do this and that, how is it possible he now needs three hours when he used to need, you know, 45 minutes or one hour? I can't speak to how things work. Particularly with a simpler protocol. I mean, you said that there was a problem previously, but there should be less of a problem now. There should be less of a problem now? Yes, because it's a one-drug protocol. Well, it does have less syringes, but we're talking about moving the inmate and people in and out. So that's the reason. Now, this difficult, to me, problem of what – is there any point during the actual execution, if it goes awry, that there's a right to counsel? That there's a right to counsel? Yes. Suppose it was two hours and they were still trying to poke these IVs in, and the inmate says, is of the view that this has approached – this has gotten to the point of being an unusual punishment. Suppose he's in serious pain. Is there any period – your position in the brief seems to be, well, if we were to terminate the attempt and delay it for a while, then there would be a right to counsel. But as long as we're still trying, there isn't one. Is that essentially your position? To a degree, Judge Brezon, it is. I think the protocol calls for a stand-down if there are – if something does go awry. We're speaking hypothetically. What's a stand-down? A stand-down would be the director just stopping the execution. Now, he can stop the execution. He can delay it and then start it again. But, for example, the base protocol had a one-hour limit on setting the IVs. The tally execution exceeded that. No. I don't believe the tally execution exceeded one hour to attempt to place IVs. It was under an hour. It was close. It was close. It was not over an hour, but it was close. And that's really the only execution where this has occurred, at least recently, taking so long to find IVs. But, again, the director has the option to stop the execution or to delay it. And if that were to occur, then the inmate would be removed from the room and he would have access to counsel. Thank you. Thank you. You have two minutes for rebuttal. Thank you, Judge McKeon. Very, very quickly, regarding the access to counsel issue, I just would like to point this Court again to the First Amendment Coalition case. We cited it, but not for this particular proposition. It's at 299F3rd868, and the pinpoint site is at 880. And the district court there said that ensuring safety is a legitimate concern, but defendants presented no evidence that the staff had ever been or were ever likely to be publicly identified or attacked. That's what we have here. There is nothing in the record that shows that there were any confidentiality concerns. We have been under a protective order. There have been attorneys who have known the identities of executioners for the last four years, and never has there been any evidence that any of that information was presented. The information about how long it's going to take, I'd ask this Court to look at Addenda 4 and 5, which are the execution logs from King and Bible, which started on time, and both of them started at 10 and 11 o'clock. And the logs indicate they were not prepared. The prisoner was not taken out of the holding cell in Housing Unit 9 to be moved until one hour before the execution. The teams weren't brought in. The witnesses are not brought in until after the prisoner is ready and the lines are set up. And I'd also ask this Court to look at the log, which is from the West execution at Addenda 7, and how different that is as far as the detail of what happened versus Towery, where there's no information of what happened and why things happened. Here ‑‑ Was there any attempted discovery since the second amended complaint was filed? Attempted discovery? Since the amended complaint, attempts at discovery. We've ‑‑ For example, with regard to what happened. Have you propounded any discovery with regard to what did happen during the Towery execution? The State only recently answered, so we have not entered into discovery yet. We've asked for settlement agreement. We've asked to have settlement discussions. You asked to mediate, and that was refused. And the State objected to that. Right now, on this preliminary injunction, Lopez has shown enough, based on the evidence that he's been able to obtain, in spite of ADC's actions preventing him from knowing information and telling his counsel when Towery's counsel asked to, if there was anything going on that he needed to know, he was told no, even though there were problems. So we ask that this Court grant a preliminary injunction so that the serious questions that Lopez has presented before this Court can be litigated below. Thank you. Thank you. Thank you both, counsel, for your argument this afternoon. This case is submitted and we're adjourned. All rise.
judges: McKeown, Berzon, Rawlinson